IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2024

IN RE CEDRIC G.

**Appeal from the Juvenile Court for Davidson County**
**No. 272147     Sheila Calloway, Judge**

_____

**No. M2023-01799-COA-R3-PT**

_____

The parental rights of Cedric G., Sr. ("Father") were terminated by the Davidson County Juvenile Court ("the trial court") on November 20, 2023.  Father appeals.  We affirm the termination of Father's parental rights as to Cedric G., Jr. ("the Child") for abandonment by an incarcerated parent for failure to visit, failure to support, and exhibiting a wanton disregard for the Child's welfare; substantial noncompliance with the permanency plans; persistence of conditions; and failure to manifest an ability and willingness to personally assume custody or financial responsibility of the Child. We also affirm the trial court's conclusion that termination is in the Child's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Cedric G., Sr.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights in order to protect their privacy and identities.

# OPINION

## BACKGROUND

This appeal concerns the termination of Father's parental rights to his minor son.[2] The family became involved with Tennessee Department of Children's Services ("DCS") in March of 2020 after Father was arrested on several charges, including driving under the influence with the Child and his older sister, Cassidy, in the vehicle. The Child was not fully removed from Father's custody after that incident, however. Rather, the children remained in their mother's custody, and Father was allowed supervised contact with them. Issues persisted, however, and DCS received reports about domestic violence and marijuana use in the mother's home. Father also continued to live in the home with the mother and have unsupervised contact with the children. Then, on January 15, 2021, Cassidy passed away after choking on a grape at the mother's home while both parents were present. DCS later determined that Father was unsupervised with Cassidy, in violation of the previous court order, when she choked. The mother tested positive for THC at the hospital. As a result, DCS established an Immediate Protection Agreement placing the Child with his maternal grandmother. According to DCS, the grandmother later tested positive for THC, which led to DCS bringing the Child into its custody in May of 2021. The trial court entered an order on May 19, 2021, finding probable cause to believe that the Child was dependent and neglected in Father's care.

DCS developed its first permanency plan on June 23, 2021, outlining requirements for Father. These included completing mental health and parenting assessments, submitting to random drug screens, and obtaining stable housing and employment. Father complied with his permanency plan to a degree; for example, it is undisputed that he completed a mental health assessment and some therapy. He also passed some drugs screens. However, his visitation rights were suspended on December 16, 2021, due to erratic behavior, such as threatening to abscond with the Child and refusing to complete drug screens. Father participated by telephone in the hearing in which his rights were suspended but hung up early. Father was required to pass three consecutive drug screens and complete his mental health assessment follow-up recommendations before his visitation would be reinstated, but this never occurred. The trial court adjudicated the Child dependent and neglected after a hearing on March 3, 2022.[3]

DCS created a second permanency plan, dated March 23, 2022, which included additional requirements due to Father's noncompliance and continued criminal activity.

---

[2] The mother's parental rights were terminated in a separate order from which she did not appeal. The Child's mother is mentioned only for context.

[3] The adjudication order was not entered until October 3, 2022.

Father cycled in and out of jail during the custodial period. He was incarcerated from April 5, 2022 to July 12, 2022 after being charged with assault against the mother, who alleged that Father broke into her apartment and attempted to strangle her.[4] Father was incarcerated again on September 5, 2023, after pleading guilty to simple possession of marijuana and being a felon in possession of a firearm, and he remained in jail at the time of the trial. Father testified at trial that he believed he would be out of jail by January of 2024.

DCS filed its petition to terminate Father's parental rights in the trial court on September 13, 2022. For statutory grounds, DCS alleged abandonment by wanton disregard, failure to visit, and failure to support, as well as substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. Meanwhile, the Child remained in the same foster home from May of 2021 up to the trial, which took place in October of 2023. When DCS initially placed the Child with his foster parents, he was nonverbal and struggling with anger and behavioral issues. Under the foster parents' care, however, the Child has received various therapies and is now doing well. The foster parents wish to adopt the Child.

Trial was held on October 2 and 3, 2023, at which the trial court heard testimony from Father, the Child's former DCS case worker, and the Child's foster parents. The trial court entered an order terminating Father's parental rights on November 20, 2023, concluding that DCS proved several statutory grounds for termination by clear and convincing evidence. Specifically, the trial court found that DCS proved abandonment, substantial noncompliance with the permanency plans, persistent conditions, and that Father failed to manifest an ability and willingness to assume custody of the Child. The trial court also concluded that termination of Father's parental rights was in the Child's best interests. Father timely appealed to this court.

## ISSUES

Father raises five issues for our review, which we restate slightly as follows:

I. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that Father abandoned the Child.

II. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, Father's substantial noncompliance with the permanency plans.

III. Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, persistent conditions.

---

[4] Father denies this.

IV.     Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that Father failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child.

V.     Whether the trial court correctly concluded that DCS proved, by clear and convincing evidence, that terminating Father's parental rights is in the Child's best interests.

STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 521–22 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly

probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

**DISCUSSION**

*Grounds for termination*

    I.    *Abandonment*

The trial court terminated Father's parental rights due to abandonment. Abandonment, as defined by Tennessee Code Annotated section 36-1-102, is a ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). There are several ways in which abandonment may occur; however, because Father was incarcerated during the four months immediately preceding the filing of the termination petition, DCS proceeded under section 36-1-102(1)(A)(iv), which provides:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

*(a)* Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

\* \* \*

*(c)* With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a & c*).[5]

Here, the four months immediately preceding the filing of the petition was May 12, 2022 through September 12, 2022. It is undisputed that Father was incarcerated from April 5, 2022 through July 12, 2022, and Father concedes that the incarcerated parent statute listed above applies. Accordingly, the pertinent period for purposes of abandonment is the four consecutive months preceding Father's incarceration, which is December 4, 2021 through April 4, 2022. *See id.*

a. Failure to visit

As to Father's failure to visit the Child, the trial court found as follows:

While Father was out of jail, he did exercise visits with the [C]hild. The visits were ultimately suspended because of Father's erratic behavior around the [C]hild and because Father tested positive for marijuana and cocaine. Father's last visit was in November of 2021. Father never filed any motion or made any attempt to lift the suspension of the visits.

---

[5] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

The trial court went on to conclude that Father failed to visit the Child in the salient period and that DCS proved this ground for termination by clear and convincing evidence.

We agree. It is undisputed that Father's last visit with the Child was in November of 2021 and that Father was required to pass three consecutive drug screens in order to reinstate visitation. Although the record shows that Father passed one drug screen in March of 2022, Father never passed three consecutive tests. According to his case worker, Father often cancelled or declined drug screens. On appeal, Father points out that he visited with the Child consistently prior to the order suspending visitation but does not dispute that there were no visits during the relevant time. The fact that Father's visits were suspended does not bar a finding that Father failed to visit the Child. *See In re Adoption of Angela E.*, 402 S.W.3d at 642; *see also In re Bentley Q.*, No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *8 (Tenn. Ct. App. Mar. 11, 2020) (affirming termination for failure to visit when "the record [was] devoid of any attempt by [the f]ather to reinstate his visitation"). Consequently, DCS proved this ground for termination by clear and convincing evidence.

b. Failure to support

As with failure to visit, it is undisputed that Father did not pay any support for the Child during the salient period or at any point during the custodial period. Father asserts on appeal that DCS failed to present sufficient evidence that Father had the means with which to support the Child. In this regard, Father appears to assert that his failure to support was not willful. However, the burden does not lie with DCS to show that Father willfully failed to pay support; rather, "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful[,]" and "[t]he parent or guardian shall bear the burden of proof that the failure to visit or support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). Father made no argument at trial that he was unable to pay support for the Child but instead testified that he makes good money detailing cars when not incarcerated. Father also testified that he believed child support was being taken out of his paychecks but offered no evidence aside from his testimony on this point. As such, Father's argument on appeal that he lacked the funds to pay child support is unavailing. We affirm the trial court's ruling as to this ground.

c. Wanton disregard

The third and final abandonment ground found by the trial court is wanton disregard. The trial court reasoned that Father showed wanton disregard for the Child due to Father's repeated and consistent incarcerations. The record supports this finding. "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68. In this case, Father has been in and

out of prison for most of the Child's life. Prior to the Child's formal removal from Father's custody, Father was arrested for driving under the influence and fleeing police at a high rate of speed with the Child and his sister in the car. After the Child's removal, Father continued to incur criminal charges for incidents related to drugs and domestic violence. Father was incarcerated yet again at the time of trial and predicted that it would be several months before he might be released.

Under all these circumstances, we have no issue concluding that Father has engaged in a pattern of repeated incarceration and criminal behavior. *See id.* Thus, we affirm the trial court's conclusion that DCS sufficiently proved abandonment by wanton disregard as a ground for termination of Father's parental rights.

## II. *Substantial noncompliance with permanency plans*

Tennessee Code Annotated section 36-1-113(g)(2) provides that a court may terminate a parent's parental rights when the parent is in "substantial noncompliance ... with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548–49.

Here, the trial court found that the responsibilities set forth in the permanency plans were reasonably related to remedying conditions necessitating foster care. It then concluded:

> There were three permanency plans[6] approved and entered during the years the [C]hild has been in DCS custody. Father participated in the development of the initial plan. Father has not completed the requirements in the permanency plan. Father is in substantial noncompliance with the permanency plan.

---

[6] The record before us contains only two permanency plans, but this does not ultimately affect our analysis.

Although Father testified that has done some of the requirements as part of the permanency plan, he has been unable to provide proof of completion of any of the assessments or proof of compliance of the recommendations from the assessments. Father is currently incarcerated with a potential release date in 2024. Father has not visited the [C]hild since November of 2021, after his visits were suspended. Furthermore, Father tested positive for controlled substances during the time he was not incarcerated. Father has not been able to continue with his visitation with the [C]hild due to his behaviors. Father has also not provided proof of income or stable housing. Therefore, there are grounds to terminate Father's rights due to the substantial noncompliance with the permanency plan.

The record supports the trial court's findings as to this ground for termination. While Father completed some of the assessments required by his permanency plans, such as a mental health assessment, this does not change the fact that he completely neglected other important aspects of the plan. As the trial court noted, critical plan requirements included Father consistently passing his drug screens and abstaining from criminal activity, neither of which he did during the custodial period. The plan also attempted to address domestic violence issues between the mother and Father; despite this, Father was arrested after a domestic incident with the mother in the spring of 2022. These issues are important and bear directly on the Child's removal from Father's custody; accordingly, it is significant that Father could not or would not complete these tasks.

Because Father's degree of noncompliance as to important permanency plan tasks is substantial, the trial court correctly concluded that DCS proved this ground for termination by clear and convincing evidence.

III.    *Persistent conditions*

The trial court also terminated Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). This statutory ground applies when:

[t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected

to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). "Each of the statutory elements that make up the ground known as persistence of conditions must be established by clear and convincing evidence." *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *8 (Tenn. Ct. App. Aug. 4, 2014) (citing *In re Valentine*, 79 S.W.3d at 550).

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016). Additionally,

this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" [Tenn. Code Ann. §] 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *9 (Tenn. Ct. App. Nov. 9, 2021).

Here, the trial court correctly concluded that this ground is supported by clear and convincing evidence. The proof shows that DCS removed the Child from Father in May of 2021, and the trial court later adjudicated the Child dependent and neglected. The primary conditions precipitating removal were drug use, domestic violence in the parents'

home, and lack of supervision. While Father took some steps toward reunification during the custodial period, by and large these conditions persist. Father failed to complete various services to improve his situation such as domestic violence classes and mental health follow ups. Most importantly, Father did not meaningfully address concerns about substance abuse during the custodial period, as he has failed to ever pass three consecutive drug tests. According to his case worker, Father frequently declined testing or would fail to show up to pre-scheduled tests. Additionally, Father did not refrain from activities leading to incarceration, as Father was in jail at the time of the final hearing. One of Father's arrests during the custodial period stemmed from a domestic incident with the Child's mother, and domestic violence in the home was one of the reasons for the Child's initial removal.

Moreover, the record clearly supports the trial court's conclusion that there is little likelihood that conditions preventing the Child's return to Father can be remedied at an early date. There is also sufficient evidence in the record to support the conclusion that a continuation of Father's relationship with the Child would greatly diminish the Child's chances of being integrated into a safe, permanent home. Indeed, Father testified that he wants the Child placed with Father's mother and sister while Father remains incarcerated; however, Father also testified about being in and out of his mother's care growing up and about how being in the foster care system had a detrimental affect on Father. Yet, Father wants the Child placed with the same people from which Father was removed. On the other hand, the Child is currently in a safe, stable, and permanent home with his foster parents. He is thriving, and his foster parents hope to adopt him.

Considering the foregoing, we agree with the trial court that DCS proved persistent conditions by clear and convincing evidence.

IV.    *Failure to manifest an ability and willingness*

Finally, the trial court found that a ground for termination existed pursuant to Tennessee Code Annotated section 36-1-113(g)(14). That section provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires the petitioner to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The

- 11 -

petitioner must first prove that the parent "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).  Second, the petitioner must prove that placing the child in the parent's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

The statute "places a conjunctive obligation on a parent ... to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).  Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

As to this ground for termination, the trial court found as pertinent:

[The Child] has been in a foster home since May of 2021 and he is thriving. He has found stability and care at their foster home. He calls the foster parents "Poppa" and "Dada" as they are [ ] the only parents he knows.

At this time Father has not manifested an ability or willingness to assume legal or physical custody or financial responsibility of the [C]hild. Father has not remedied the conditions that are reasonably related to the [C]hild remaining in foster care for over two (2) years including the most basic responsibilities of maintaining safe, stable and appropriate housing, a stable source of income, and maintaining sobriety. Furthermore, placing the [C]hild in his legal and physical custody would pose a risk of substantial harm to the welfare of the [C]hild. DCS has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(g)(14).

We agree with the trial court that this ground was established by clear and convincing evidence.  Ultimately, Father's actions throughout the custodial episode do not evidence meaningful efforts to establish stability for the Child.  Father continued to incur criminal charges stemming from the same behavior necessitating the Child's removal to begin with.  He also could not, at the time of trial, provide the most basic responsibilities such as safe, stable and appropriate housing, a stable source of income, or maintain sobriety.  Moreover, Father was not consistent with visitation.  Father's visitation was suspended early in the custodial period, and he was unable to pass three consecutive drug screens to reinstate visitation.  Although Father expressed in a letter to the trial court that he wants to do better, the inquiry into a parent's willingness involves more than a parent's verbal expressions.  *See In re Eli H.*, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at *10 (Tenn. Ct. App. May 8, 2020) (noting that a parent's inaction, notwithstanding their stated desires, can demonstrate a lack of willingness).  The record supports the trial court's

conclusion that placing the Child in Father's custody at this point poses a significant risk of harm to the Child. The Child has made great strides in his placement and is poised to be adopted. He is bonded to his foster parents and has not seen Father in several years.

Consequently, we affirm the trial court's conclusion that Father's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

*Best interests*

Having determined that grounds for termination exist, we must next determine whether terminating Father's parental rights is in the Child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d at 573. As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194. Tennessee Code Annotated section 36-1-113(i), which lists factors to be considered as part of the best interests inquiry, states that the trial court "shall consider all relevant and child-centered factors applicable to the particular case before the court." Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of statutory factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White*, 171 S.W.3d at 194).[7]

In this case, the trial court correctly applied the correct factors found at section 36-1-113(i), reasoning as follows:

---

[7] We note that this case is distinguishable from *In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349 (Tenn. Ct. App. June 11, 2024), which was remanded for the trial court to consider all of the best interest factors. In that case, the trial court made findings only as to six factors when the parties had raised fourteen factors as being applicable. We held that "[t]he court's failure to expressly discuss these factors and all other relevant factors limits our ability to conduct appropriate appellate review of the trial court's determination that termination was in the best interest of the child." *Id.* at *15. We do not have such difficulty in the present case.

- 13 -

**(1) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.**

The [C]hild currently receives care that was not provided before he came into DCS custody. He has been in the same foster home since his removal and has built strong relationships with his foster family. This foster home is pre-adoptive and the foster parents are willing to provide the continuity and stability the [C]hild needs.

**(2) The effect and change of caretakers and physical environment are likely to have on the child's emotional, physical, and mental condition.**

The [C]hild has been in foster care for over two years now. He has spent a significant part of his life with [his foster] family where he has overcome many issues. The [foster] family has provided the services needed for his emotional, physical, and mental wellbeing. Therefore, a change in caretakers and physical environment would be detrimental to his emotional, physical, and mental condition.

**(3) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs.**

In this case, Father has not demonstrated continuity or stability. Father has been in and out of jail during the period the [C]hild has been in foster care. Father is still currently incarcerated. Father has not shown the ability to take care of his own needs, better yet the [C]hild's needs.

**(4) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such an attachment.**

Father has not seen [the C]hild for almost the entire time he has been in foster care. His visits were suspended after his erratic behavior during one of his visits and his positive drug screen for illegal substances. Father has not supported [the C]hild in any way. Therefore, there is no attachment between Father and [the C]hild.

**(5) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.**

As stated before, Father has been incarcerated for several months and has not seen [the C]hild since November of 2021. Therefore, a positive relationship with [the C]hild is unlikely.

**(6) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent.**

The [C]hild has been with the [foster] family since he was almost three years old. He is currently five years old now. They have created a bond with the [C]hild and have provided for all his needs. The [C]hild calls them "Poppa" and "Dada".

**(7) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner[.]**

Father has been in and out of jail during the time the [C]hild has been in foster care. Father is currently incarcerated. Father has also continued to test positive for illegal substances. Father has shown an inability to create a stable environment for [the C]hild.

**(8) Whether the parent has taken advantage of the available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions[.]**

Father has not completed his permanency plans which recommend various treatments. Although Father testified that he completed some assessments, he has not provided proof of completion to DCS. Furthermore, he did not follow the recommendations of the evaluations. Father has not taken advantage of the available programs or community resources available to get [the C]hild back.

**(9) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstances, conduct, or conditions that made an award of custody unsafe and not in the child's best interest[.]**

- 15 -

Father has not demonstrated a sense of urgency in addressing the circumstances which caused the [C]hild to be placed in DCS custody. The [C]hild has been in foster care for over two (2) years. Father has not addressed the steps of the permanency plan and he has been unable to complete the plan within the two (2) years the [C]hild has been in the custody of DCS. Father has not rendered the conditions that would make an award of custody safe for the [C]hild.

**(10) Whether the parent has ever provided safe and stable care for the child or any other child[.]**

Father has not been able to provide for a safe and stable environment for [the C]hild. Furthermore, Father is currently incarcerated and will not be released until possibly January of 2024. He is currently not able to provide a safe and stable environment for [the C]hild.

**(11) Whether the parent has demonstrated the commitment to creating and maintaining a home that meets the child's basic and specific needs in which the child can thrive[.]**

Father has not been responsive to DCS to show that he is committed to maintaining a home for the [C]hild to thrive. Father currently does not have stable housing and is incarcerated. Therefore, he has not demonstrated a commitment to creating and maintaining a home meeting the needs of the [C]hild.

The record largely preponderates in favor of the trial court's factual findings regarding the Child's best interests. Overall, Father has not made meaningful changes in his life since the Child's removal, and the Child is by all accounts thriving in his present placement. The Child's foster family wishes to adopt him, and we agree with the trial court that removing the Child after the progress he has made would be detrimental to his well-being. Accordingly, the trial court correctly found that terminating Father's parental rights is in the Child's best interests.

### CONCLUSION

The ruling of the Juvenile Court for Davidson County is affirmed. Costs on appeal are assessed to the appellant, Cedric G., Sr., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE